UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Frances Weinroth,
        Plaintiff

        v.                          Case No. 22-cv-0408-SM-TSM
                                    Opinion No. 2025 DNH 118
State of New Hampshire,
Department of Health and Human
Services, New Hampshire Hospital;
Dartmouth-Hitchcock Clinic; and
Barbara Dieckman,
        Defendants

## O R D E R

Plaintiff, Frances Weinroth, filed suit against her former employer, the New Hampshire Department of Health and Human Services (New Hampshire Hospital), along with Dartmouth-Hitchcock Clinic and its employee, Barbara Dieckman.  Weinroth asserts claims for hostile work environment, constructive discharge, retaliation, and aiding and abetting discrimination under Title VII, 42 U.S.C. § 2000e et. seq. and New Hampshire Rev. Stat. Ann. 354-A.[1]  Defendants have filed a joint motion for summary judgment on each of plaintiff's claims.  Plaintiff objects.

---

[1]    Plaintiff also asserted a claim for violation of the Family Medical Leave Act, 29 U.S.C. § 2601, et seq., but has since agreed to dismissal of that claim.  See Document No. 35-1 at 24.

## STANDARD OF REVIEW

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Gattineri v. Wynn MA, LLC, 93 F.4th 505, 509 (1st Cir. 2024) (quoting Fed. R. Civ. P. 56(a)). A genuine factual dispute exists if "the evidence is such that a reasonable jury could resolve the point in the favor of the non-moving party," and a material fact is one "that has the potential of affecting the outcome of the case." Hamdallah v. CPC Carolina PR, LLC, 91 F.4th 1, 16 (1st Cir. 2024) (internal quotation marks omitted). To decide a summary judgment motion, the court draws all reasonable inferences in favor of the nonmoving party from the properly supported facts in the record. Lech v. von Goeler, 92 F.4th 56, 64 (1st Cir. 2024). However, "the 'test for summary judgment is steeped in reality,' so the non-moving party cannot rely on 'conclusory allegations, improbable inferences, and unsupported speculation' to establish a dispute of material fact." To-Ricos, Ltd. v. Productos Avicolas Del Sur, Inc., 118 F.4th 1, 10 (1st Cir. 2024) (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)).

## BACKGROUND

The relevant facts, viewed in the light most favorable to
Weinroth, the party opposing summary judgment, are as follows.
Weinroth began working at New Hampshire Hospital, a state-run
psychiatric hospital located in Concord, New Hampshire, in 2014.
She was hired as a specialist in the Information Services
department.  In that capacity, she provided supervision and
oversight related to the hospital's electronic health record
("EHR") system.

Weinroth initially reported to David Levesque, who served
as the hospital's director of Information Systems.  In early
2020, Levesque was reassigned, and at that point Weinroth began
reporting to Heather Moquin, the hospital's Chief Operations
Officer, who was soon promoted to Chief Executive Officer.  The
IS program specialist team consisted of Weinroth and four or
five other team members.  Weinroth's performance evaluations
were generally positive, at least through 2018, which appears to
be the last year that she received a formal performance
evaluation.

Defendant Barbara Dieckman was hired by Dartmouth Hitchcock
Clinic in 2018 as a director of data and information systems.
Under a contractual agreement between DHHS and DHC, she was
assigned as a consultant to New Hampshire Hospital, overseeing
implementation of a new electronic health records system.  In

that capacity, Dieckman managed and directed the technical work performed by Weinroth and her co-workers.  Dieckman remained an employee of Dartmouth Hitchcock Clinic, and, because the collective bargaining agreement between the State of New Hampshire and the State Employees' Association does not permit direct supervision or discipline of state employees by outside contractors, Dieckman's supervisory consultant role was necessarily limited.

Nevertheless, Weinroth says that she was informed in October, 2018, that Dieckman would be her "supervisor," and that, while Dieckman "could not discipline or do yearly reviews because she was not a State employee," she would be directing Weinroth's work and could recommend disciplinary action. Document No. 35-2.  Weinroth argues that Dieckman had the power to impose disciplinary action, indirectly, by conferring with Moquin, since Moquin did "whatever [Dieckman] requested." Document No. 35-2.

**Early Interactions between Dieckman and Weinroth**

The IS department used a software system called NetSmart. In October, 2018, Dieckman offered Weinroth the opportunity to enroll in a two-day training class on NetSmart.  Dieckman and Weinroth did not attend training together, but, according to Weinroth, they met in the morning, prior to each day's session, to prepare for class.  Dieckman's decision to offer Weinroth the

4

NetSmart training opportunity caused friction within the IS department.  Weinroth explained: "there [were] other people in my department that couldn't do [the training], and immediately there [were allegations of] favoritism, why is [Weinroth] allowed to go to the training and we didn't get to go to it." Document No. 30-6 (Weinroth Dep.) at 21:19-23.

A few weeks after the training, Weinroth says that Dieckman approached her in the hospital cafeteria, and hugged her.[2]  See Document No. 30-6 (Weinroth Dep.) at 23:8-11 ("[Dieckman] asked me how I was doing.· She walked up to me and gave me this huge hug in the middle of the cafeteria in front of all of – all of the people that I worked with.").  Weinroth was accompanied at the time by Debra Hendry, another program specialist in the IS department.  Dieckman did not hug Hendry.  The hug made Weinroth uncomfortable, but she did not report the hug to anyone at the time.  Id. at 24:17-21.

Hendry, however, reported the hug to Levesque, and he raised the "hugging incident" at the weekly team meeting. Document No. 35-2.  Weinroth says that Levesque asked her why Dieckman had hugged her, "inferring [Weinroth] was trying to buddy[]up to Dieckman."  Document No. 35-2.  Weinroth responded

---

[2]    Defendants dispute that Dieckman ever hugged Weinroth. However, for purposes of the present motion, the court necessarily accepts plaintiff's version of events.

that she "didn't know why [Dieckman] hugged [her] and confirmed
it was not something [Weinroth] encouraged."  Id.

**April, 2019, Memo of Counsel**

On April 5, 2019, Weinroth received a letter from Levesque
entitled, "Notice of Suspension with Pay and Investigation,"
which alleged that Weinroth had been "disrespectful and
disruptive to [her] coworkers within the IS department resulting
in an exceedingly hostile work environment."  Document No. 30-5.
Weinroth was suspended with pay from April 8, 2019 through April
22, 2019, while an investigation into the allegations was
conducted.

On April 23, 2019, Levesque issued a "Memo of Counsel,"
concluding that Weinroth's conduct had been disrespectful and
disruptive.  Document No. 30-5.  The memo states:

> On April 4th[,] you were upset about the Netsmart
> classes discussed on April 3rd and made your co-
> workers feel very uncomfortable by making
> disrespectful comments and forcefully slamming items
> in your shared work area.
>
> You have been unwilling to be a team player regarding
> training co-workers.  You have blocked your co-
> workers from sharing your calendar which hinders
> planning.  You commented that you believe that staff
> may be purposefully making changes to your computer
> access.

Id.

The Memo of Counsel prescribed a corrective action plan for
Weinroth, which required, among other things, that she "cease

disrespectful, disruptive and disorderly behaviors in the workplace," and advised that if Weinroth did not "meet the work and performance expectations of the unit" or "follow the corrective action plan, disciplinary action may result." Id.

Weinroth submitted a rebuttal to the Memo of Counsel on May 1, 2019, disputing Levensque's investigatory findings. The rebuttal stated that Weinroth did train "people in the hospital whether in [her] department or out on the units," and that she was frequently solicited for training by other hospital employees because she knew "how to do things right." Id. And, Weinroth said, she had not been forcefully slamming items on April 4, but rather "putting documentation in binders using a hole punch and throwing [out] old paperwork."[3] Id. Finally, Weinroth explained that, while she had blocked people from editing her calendar, it was only because she had noticed that some of her meetings "were being removed" by others. Id. The conduct leading to the Memo of Counsel had no apparent connection with Dieckman.

---

[3]    In a declaration submitted in support of her opposition to summary judgment, Weinroth further explains that, while cleaning her office space, the broom she was using to sweep hit a plant on her bookshelf. The plant fell onto the ground and broke. Document No. 35-2.

**Post-Meeting Hugs and Leg Touching**

At some point in 2018 or 2019,[4] Dieckman began having one-on-one meetings in her office with the IS program specialists. The meetings occurred a few times a month, held typically on Mondays.  At the end of their meetings, Dieckman sometimes hugged Weinroth.

In her complaint, Weinroth alleged that Dieckman hugged her on three occasions after meetings in 2019 while the blinds to Dieckman's office and her office door were shut: once in September, and twice in November.  See Compl. ¶ 17.  During her deposition, Weinroth testified:

> Me, myself, I can't tell you the amount of times, but maybe three is not a good answer, but I know there was plenty of times I was in Barbara's office and she would hug me before I left.
>
> Q:    Well, you wrote in your statement that happened approximately three different occasions, correct?
>
> A:    That's what the statement says.
>
> Q:    The statement that you signed?
>
> A:    Yes.

Document No. 30-6 (Weinroth Dep.) at 30:16-31:2.  In support of her opposition to summary judgment, Weinroth asserts that

---

[4]    Weinroth initially alleged that the meetings began in May, 2019, but later testified that the meetings started in late 2018.

Dieckman gave her post-meeting hugs on at least 12 separate occasions.  See Document No. 35-2.

According to Weinroth, Dieckman also hugged Donna Wurtz, another program supervisor, following their own one-on-one meetings.  She says that Wurtz told her that Dieckman had "hugged Wurtz once and thereafter [Wurtz] made sure she sat close to the door in order to leave immediately after her meetings to ensure Dieckman couldn't hug her."[5]  Document No. 35-2.

Then, in May, 2019,[6] during a team meeting attended by Dieckman, Weinroth, and others, Dieckman reached under the table, put her hand on Weinroth's leg, and rubbed her thigh.  Weinroth was wearing a dress at the time without stockings, and her legs were bare.  Weinroth believed Dieckman "was trying to feel her up," and immediately pushed Dieckman's hand away.[7]  Document No. 35-2.

---

[5]    Dieckman denies ever hugging Weinroth.  She concedes, however, that she hugged Wurtz once, upon Wurtz's retirement from the hospital.

[6]    The record is unclear regarding the timing of several of the incidents alleged by Weinroth.  In her declaration, Weinroth says the leg-touching incident occurred in April or May of 2019.  See Document No. 35-2.

[7]    Dieckman denies that she ever touched Weinroth's leg.  See Document No. 30-10 (Dieckman Dep.) at 86:1-3 ("Q: Do you remember what you told [the investigator] about the allegation that you touched her leg?  A: I think I said ew, no.").  Again,

**Repeated Compliments and Pet Names**

Dieckman frequently complimented Weinroth, telling her that she smelled good, or looked "really good today."  Document No. 35-2.  Dieckman does not recall ever giving Weinroth a compliment, but she conceded, "If I see something on somebody that, you know, I might say something like, I really like that top or I really like that outfit."  Document No. 30-10 (Dieckman Dep.) at 74:14-22.

Dieckman also sometimes called Weinroth "sweet pea."  While she testified that she did not remember ever calling Weinroth "sweet pea," Dieckman explained that she had just completed an assignment in Houston, Texas, where "sweet pea" was a fairly common expression, and had incorporated the phrase into her vernacular.  So, Dieckman did refer to her coworkers at New Hampshire Hospital as "sweet pea" on occasion, but she says her use of the term was not "isolated to Fran."  Id. at 75:14-76:4.

On or about January 25, 2020, the NetSmart system crashed. Fortunately, Weinroth was able to quickly restore it.  After Weinroth informed Dieckman that she had the system functioning again, Dieckman said, "I love you."[8]  Weinroth was so caught off

---

however, Weinroth's version of events must be taken as true for purposes of summary judgment.

[8]    Dieckman denies ever telling Weinroth that she loved her. See Document No. 30-10 (Dieckman Dep.) at 75:9-13 ("Q: Did you

guard by Dieckman's statement that she decided that she did not want to talk to Dieckman on the phone anymore, and would email her updates going forward.  Document No. 30-6 (Weinroth Dep.) at 42:9-16.

**November, 2019, Memo of Counsel**

On November 5, 2019, Weinroth received a second Memo of Counsel, again for disrespectful and disruptive comments and conduct.  The Memo of Counsel was signed by Moquin, and this memo was also signed by Dieckman.

The November Memo describes several instances of objectionable conduct by Weinroth, including rude behavior directed at a new team member, responding aggressively to a co-worker's questions, and making repeated sarcastic comments about a co-worker.  The memo further notes that Weinroth had several outstanding and incomplete work assignments.  Document No. 30-5.  Weinroth refused to sign the November Memo of Counsel, but she did not submit a formal rebuttal.

**Weinroth Reports Dieckman's Conduct**

At some point in 2019 or 2020, Weinroth approached Barbara McCann, who worked in the hospital's Human Resources department.

---

ever tell Ms. Weinroth I love you?  A: No.  Q: Did you ever say that even related to some work task?  A: No.").  Weinroth's version of events controls for purposes of ruling on the summary judgment motion.

McCann's and Weinroth's recollections as to when their conversation occurred differ significantly.  Weinroth remembers the conversation as taking place in January or February, 2020, (and specifically on January, 28, 2020) while McCann remembers the conversation as occurring in April, 2019.[9]

Weinroth's and McCann's recollections of the substance of their conversation differ, too.  Weinroth recalls telling McCann that Dieckman's hugging was making her uncomfortable.  For her part, McCann says that Weinroth initially approached her because she was upset about receiving a Memo of Counsel.  McCann recalls Weinroth then reported that "Barbara Dieckman had made her uncomfortable by touching her leg, [and] that [Weinroth] had known that Barbara Dieckman was a homosexual."  Document No. 30-17 (McCann Dep.) at 16:20-23.  Details aside, it is apparent that Weinroth put McCann on notice of her complaint about Dieckman's inappropriate behavior toward her.  In response, McCann says she:

> asked [Weinroth] some questions because normally if there's any kind of concern with that we have a third party investigate it with the Department of Personnel.  So I asked her if [the conduct] had been repetitive or [pervasive] and she said no.  I asked her if there were other occasions where Barbara had touched her and she said no.  I asked her if Barbara had invited her to have lunch privately or go out for drinks or reach her off hours and she . . . said no.

---

[9]    There is some indication in the record that the conversation probably occurred in November, 2019, following Weinroth's receipt of the November, 2019, Memo of Counseling.

> I asked her if she would like me to bring this
> forward to the director of HR . . . to review to
> decide if a third party was going to investigate from
> the Department of Personnel and she said no.  I let
> her know that, you know, the door was open to come
> back if she wanted to think about it and let me know
> that [it] was an option if that behavior continued.

Id. at 17:1-18.

After that conversation, and notwithstanding Weinroth's declining to pursue her complaint, McCann raised Weinroth's complaint during weekly meetings with her own supervisors, to determine whether the complaint still ought to be investigated. McCann was told that "they didn't think it should at this point because it wasn't repetitive action" and because "the employee did not want to move . . . forward." Id. at 19:7-10.  Still, McCann also spoke with Moquin about Weinroth's allegations. Moquin then discussed the matter with Dieckman, informally counselling her about boundaries and proper conduct at work. Moquin testified that Dieckman was

> shocked and offended at [Weinroth's] statement and we
> had a conversation really with me just saying to her,
> you know, it's shocking, you know, I could see that
> she was upset by that allegation, but we talked about
> just remembering, you know, boundaries and awareness
> of physical space.

Id. at 42:5-14.  After speaking with Moquin, Dieckman reached out to McCann to discuss best practices for meeting and interacting with Weinroth going forward.  See id. at 27:10-33:14.

13

At that point, Moquin began attending the one-on-one office meetings between Dieckman and Weinroth.  Moquin says her reasons for attending the meetings were twofold.  First, Moquin was concerned that Weinroth had concocted her complaint about Dieckman in retaliation for Dieckman's role in the November, 2019, Memo of Counsel given Weinroth.  Document No. 30-11 (Moquin Dep.) at 44:19-22 ("[Moquin's] opinion was that [she] didn't think Barbara Dieckman had done anything at all and [she] felt that Fran was angry, in general, and was a bit retaliatory"); see also id. at 97:1-4 ("[Moquin] felt that [Dieckman] should have someone there, if [Dieckman] was meeting with Fran, as a witness").  Second, Moquin wanted to avoid any potential allegations from the state employee's union that Dieckman was improperly supervising Weinroth, in violation of the collective bargaining agreement.

**January, 2020, Investigation and Letter of Warning**

On January 29, 2020, Moquin initiated yet another investigation into Weinroth's conduct based on new allegations that she had behaved disruptively and unprofessionally. Weinroth was suspended with pay during the pendency of the investigation, from January 30 through February 7.  She returned to the office on February 10.

The investigation was related to events that occurred on January 28 and 29 involving Weinroth and Wurtz.  Moquin's letter

to Weinroth summarizes those events.  While training a new
employee, Wurtz asked Weinroth for assistance.  Weinroth
responded to Wurtz in a manner that witnesses who observed the
interaction characterized as "rude and hostile," and "creat[ing]
a tense work atmosphere for all."  Document No. 30-5.  Weinroth
then attempted to discuss the incident the following day during
a team meeting, and became upset and raised her voice.  Id.
After the meeting, Weinroth returned to her desk, tore down a
poster about respect that was hanging on the wall, and threw it
into the trash.  Finally, the letter notes, on January 30,
Weinroth called Moquin, "very upset and making statements about
returning to the workplace in a disruptive and hostile manner
due to a proposed temporary office assignment and the pending
investigation."  Id.

　　In the course of Moquin's investigation, Weinroth told
Moquin that she felt "constantly bullied" at work, and that
Wurtz was often rude to her.  Id.  Weinroth admitted that she
had taken the "respect" poster down and thrown it in the trash.

　　Following the investigation, on February 10, 2020, Weinroth
was issued her first Letter of Warning.  That letter, signed by
Moquin, states that it is the consequence of multiple incidents
of Weinroth's "disruptive, disorderly, or disrespectful conduct
in the workplace, including use of insulting or abusive language
or gestures and violation of a posted or published state or

agency policy or procedure[.]"  Id.  Weinroth submitted a
rebuttal on February 19, 2020, denying that she had been
disrespectful, disruptive, or disorderly.

At that time,[10] in an effort to "reduce tension" and
"reestablish trust among the team," Moquin relocated Weinroth
from the team's shared office space to a different work station.
Document No. 30-11 (Moquin Dep.) at 20:11-21.  Weinroth's new
space was physically separate from her team members, but located
on the same floor and adjacent to Moquin's office.  Moquin
explained her decision:

> Fran said that she didn't feel comfortable in the
> [team's shared office] space; she felt that the staff
> were touching her items on her desk and some of her
> personal items.  The other staff felt uncomfortable
> with Fran because of the slamming and some of the
> abrasive behavior.  So, essentially, I replicated her
> work station, file cabinet, desk, computer, in a
> different area.

Id. at 21:13-20.  According to Weinroth, that move "caused [her]
to be separated from [her] team" and "made [her] job more
difficult."  Document No. 35-2.

**February, 2020, Conference Room Incident**

On or about February 20, 2020, after a meeting attended by
Weinroth and Dieckman in a conference room, Dieckman put her arm

---

[10]    Moquin initially testified that she relocated Weinroth
following the April, 2019, investigation, but, after realizing
that Weinroth had been reporting to Levesque in April, 2019,
corrected her testimony to state that Weinroth's relocation had
likely occurred following Moquin's January, 2020, investigation.

around Weinroth's waist as they were walking out of the room.

Weinroth says she pushed Dieckman's hand away.  Dieckman does

not recall the incident, but conceded that it was possible that

she had touched Weinroth's back while "trying to get into a

chair," since that particular conference room was extremely

narrow, with limited space between the wall and the chairs.

Document No. 30-10 (Dieckman Dep.) at 86:4-12.

**February, 2020, Notice of Investigation**

On February 26, 2020, Weinroth received another Notice of

Investigation, this one arising out of an incident on February

21, 2020.  The Notice states:

> Concerns regarding your behavior were reported during
> discussions regarding the processes surrounding
> fields that should have been unrequired, questions
> were raised regarding your completion of this task as
> well as honesty with team members when technical
> issues occurred.

Document No. 30-5.

Following Moquin's investigation, Weinroth received a

second Letter of Warning on April 15, 2020.  That letter

describes the February 21 incident as a "stressful situation

. . . in the computer lab which involved [Weinroth] behaving in

a disruptive way and also potentially being dishonest."  Id.

Moquin's investigation determined that Weinroth had been tasked

with ensuring certain mandatory fields on a form used by the

nurses were turned off.  But, the mandatory fields were not

17

turned off, and, when asked to fix the issue, Weinroth became

agitated and frustrated.  She was questioned by co-workers, and

denied knowing about the issue, which was patently untrue.  The

letter reads:

> Multiple witness statements support the finding that
> you were unable to demonstrate emotional control or
> frustration tolerance in the workplace.  This created
> tension and concern among the team.  In addition,
> witnesses report that you lied when asked questions
> about work completed.  You have <u>not</u> demonstrated the
> ability to maintain professionalism or control of
> your responses in the workplace despite previous
> memos of counsel, a previous letter of warning, and
> coaching.

Document No. 30-5 (emphasis in original).

Weinroth submitted a rebuttal on April 24, 2020.  She

placed blame for the incident largely on her coworker, Susan

Tierney, who, Weinroth said, assured her prior to the incident

that she "had [Weinroth's] back," and would handle any issues

that arose relating to the fields.  Document No. 30-5.  Weinroth

wrote that the lessons she had learned from the incident were:

(1) to notify someone earlier in the process about the issue

with the fields; and (2) "never believe someone if they say they

have your back."  <u>Id.</u>

**<u>Weinroth's Medical Leave and Return to Work</u>**

By February, 2020, Weinroth was extremely stressed due to

her situation at work.  She saw her primary care provider, Jean

Bell, an advanced practice registered nurse, to discuss her

stress and the anxiety she was experiencing.  Bell referred her to a mental health counselor, and completed a medical certification so Weinroth could take a month's leave under the Family Medical Leave Act.  After it was approved, Weinroth took medical leave starting February 26, 2020.

After Weinroth's medical leave expired and she returned to the office, she says Dieckman began repeatedly asking whether she had looked for another job, suggesting that Weinroth apply to work at other locations.  Document No. 35-2.  Weinroth believed that because she had repeatedly turned down Dieckman's advances and reported her to Human Resources, "Dieckman was trying to get rid of [me]."  Id.  During that period, Weinroth asked to move her desk back, to sit with her team.  But, as Weinroth puts it, she was given "the run around between Moquin and Dieckman, each stating it was the other [who] makes the decision."  Id.  Weinroth remained at her desk near Moquin's office.

**Weinroth Resigns**

On June 9, 2020, yet another investigation into Weinroth's workplace conduct was opened, due to a "series of emails [Weinroth] sent to a coworker," and "negative comments [Weinroth made] regarding a team member to one of the [IS] staff."  Document No. 30-5.  Weinroth was again suspended with pay while the investigation was pending.

The following day, June 10, Weinroth tendered her letter of
resignation, effective June 26, 2020.  The letter attributes her
resignation to "lack of chain of command, trust and
communication," and complains about "poor management decisions,"
lack of training, and "conflicts with gaining access to the
system."  Document No. 30-5.  In her letter, Weinroth warned
that the hospital's IS employees were insufficiently trained,
and as a result she "fear[ed] for patient safety at New
Hampshire Hospital."  Id.

Weinroth's June 10 letter does not mention sexual
harassment.  She later explained that she "did not want to state
specifically that it was due to sexual harassment as the letter
was going to my harasser (Dieckman) as well as Moquin, and I had
already been retaliated against and I was scared and embarrassed
this happened to me, and knew this would be in my personnel
file."  Document No. 35-2.  On June 16, 2020, Weinroth discussed
her decision to resign with her medical provider, Bell, and told
Bell that she resigned because "it seemed like [whatever] she
did she was being written up for."  Document No. 39-1.

About a week later, on June 18, 2020, however, Weinroth
emailed Moquin that she would be speaking with an attorney later
that morning, and wrote, "I told you I resigned because of
patient safety . . . there is a lot more to this story."
Document No. 30-5.  Later that day, Weinroth emailed Moquin and

Sean Bolton, the State Employee Association Field Representative
Negotiator, informing them that the actual reason for her
resignation was the sexual harassment and retaliation she had
been subjected to.  The email reads: "I had reported to Barbara
McCann awhile ago that Barbara Dieckman was sexually harassing
me.  Nothing was done and now I have resigned due to being
harass[ed]."  Document No. 30-5.

**State of New Hampshire, Division of Personnel, Investigation**

After receiving notice of Weinroth's harassment
allegations, Marilyn Doe, the Director of Human Resources for
the Department of Health and Human Services, directed that
Weinroth's claims be investigated by the State Division of
Personnel.  Investigator Gene Marchese began an investigation,
which was completed on July 14, 2020.  In the course of his
investigation, Marchese interviewed Weinroth, Dieckman, Moquin,
and Hendry.

Weinroth's statement to Marchese details the hugs she
received from Dieckman (which, she says, occurred on at least
four occasions); Dieckman's rubbing of her bare thigh under the
table during a team meeting; Dieckman's touching of Weinroth's
waist as they left a conference room; and Dieckman's repeated
comments and compliments.  That statement also describes
Weinroth's conversation with McCann, during which she reported
Dieckman's hugging.

Hendry told Marchese that she had never seen Dieckman hug Weinroth, or anyone else, or act inappropriately in any way. Hendry said that Dieckman sometimes referred to staff meetings as "cuddle huddles" and gave out high fives, but Hendry had never seen her hug anyone. She did say that Dieckman had occasionally yelled at Hendry in front of her co-workers (Hendry reported that behavior to Human Resources).

Moquin stated that she had not received any other complaints about Dieckman, that Weinroth's own behavior at work was "out of control," and that Weinroth had been repeatedly counseled about her work behavior. Document No. 39. Finally, Dieckman stated that she did not remember ever hugging Weinroth, had never rubbed Weinroth's thigh, and she had never told Weinroth that she loved her. Like Moquin, Dieckman noted Weinroth's history of misconduct and unstable behavior in the workplace.

Based on the foregoing, Marchese administratively determined that Weinroth's claim was unfounded, concluding: "[t]hroughout her tenure at [New Hampshire Hospital], Ms. Weinroth appeared to have difficulties in maintaining emotional stability and respectful behavior in the workplace." Document No. 39. Suit followed.

**DISCUSSION**

Weinroth asserts the following claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e <u>et seq</u>, and N.H. Rev. Stat. Ann. 354-A: (1) hostile work environment on the basis of gender and sexual harassment; (2) constructive discharge; (3) an aiding and abetting discrimination claim against Dieckman and Dartmouth-Hitchcock; (4) two retaliation claims; and (5) a Family Medical Leave Act claim, which has since been dismissed voluntarily.

**I.    Sexual Harassment - Hostile Work Environment**

Weinroth alleges that defendants violated state and federal law by subjecting her to severe and pervasive sexual harassment that "no reasonable person would be expected to endure."  Compl. ¶ 42.  To prevail on a Title VII hostile work environment claim,[11] a plaintiff must establish:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter *86 the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct

---

[11]    Hostile work environment claims under New Hampshire's anti-discrimination law are analyzed under Title VII's standards.  <u>See</u> <u>Hudson v. Dr. Michael J. O'Connell's Pain Care Ctr., Inc.</u>, 822 F. Supp. 2d 84, 92 (D.N.H. 2011) ("Because the New Hampshire Supreme Court relies on Title VII cases to analyze claims under RSA 354-A, the court will address the claims together using the Title VII standard.") (citing <u>Madeja v. MPB Corp.</u>, 149 N.H. 371, 378, 821 A.2d 1034 (2003)) (further citations omitted).

was both objectively and subjectively offensive, such
that a reasonable person would find it hostile or
abusive and the victim in fact did perceive it to be
so; and (6) that some basis for employer liability
has been established.

Pike v. Budd, 133 F.4th 74, 85–86 (1st Cir. 2025) (citations

omitted).  In assessing "whether a work environment is

sufficiently hostile or abusive," courts must consider the

totality of the circumstances, including "the frequency of the

discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work

performance."  Lee-Crespo v. Schering-Plough Del Caribe Inc.,

354 F.3d 34, 46 (1st Cir. 2003) (internal quotations omitted).

The Supreme Court instructs that, when assessing Title VII

claims, courts should keep in mind that Title VII is not a

"general civility code."  Oncale v. Sundowner Offshore Servs.,

Inc., 523 U.S. 75, 80 (1998).  As our court of appeals explains:

A hostile work environment generally is not created
by a "mere offensive utterance," Harris [v. Forklift
Sys., Inc., 510 U.S. 17, 23 (1993)]; nor does it
arise from "simple teasing, offhand comments, and
isolated incidents."  Faragher v. City of Boca Raton,
524 U.S. 775, 788 (1998).  Courts are supposed to use
"[c]ommon sense, and an appropriate sensitivity to
social context," to distinguish between such
innocuous behavior and severely hostile or abusive
conduct.  Oncale, 523 U.S. at 82.

Kosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2008).

24

Finally, it is "well established that sex discrimination consisting of same-sex sexual harassment is actionable under Title VII." Nieves-Borges v. El Conquistador Partnership, L.P., S.E., 936 F.3d 1, 9 (1st Cir. 2019) (citing Oncale, 523 U.S. at 82). "As with all harassment, same-sex harassment must be 'because of sex' to be actionable under Title VII." Baugham v. Battered Women, Inc., 211 Fed. Appx. 432, 438 (6th Cir. 2006) (citing Oncale, 523 U.S. at 80). "In other words, Plaintiffs must show that but for their gender they would not have been harassed." Id. (citations omitted). See also Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 258-59 (1st Cir. 1999) ("The statutory 'because of ... sex' requirement is not met merely because workplace harassment involves sexual matters: the substance of the violation is discrimination based on sex or, as the Court put the matter, 'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'") (quoting Oncale, 523 U.S. at 80).

Defendants make three principal arguments in support of their motion for summary judgment on plaintiff's hostile work environment claim. First, they argue that Weinroth fails to sufficiently establish that the harassment she alleges was based on sex. Second, they argue that no reasonable person would view the conduct alleged by Weinroth as severe or pervasive.

Finally, defendants contend that Weinroth fails to establish a basis for holding them liable for the alleged harassment.

### A.  **Because of Sex**

Defendants assert that Weinroth must establish not only that Dieckman is a lesbian (a fact the parties do not dispute), but also that Dieckman made "explicit or implicit proposals of sexual activity."  Defs.' Mem. in Supp. of Summary Judgment at 19 (quoting La Day v. Catalyst Tech., Inc., 302 F.3d 474 (5th Cir. 2002)).  Defendants argue that Weinroth has not done so here, because the conduct she alleges is merely the "sort of casual contact which might be expected between friendly co-workers," conduct plainly insufficient to establish discrimination because of sex.  Id. at 19.

The disputed facts, viewed in the light most favorable to Weinroth, however, do not support defendants' argument. Weinroth says that Dieckman rubbed her bare thigh under the table, hugged her several times, told her "I love you," called her "sweet pea," and put her arm around Weinroth's waist.  A consulting supervisor's uninvited rubbing of a subordinate's bare thigh, under a table, during a meeting at work, could reasonably be interpreted by a jury as more than "casual contact" between work friends.  Cf., Billings v. Town of Grafton, 515 F.3d 39, 48 (1st Cir. 2008) ("behavior like fondling, come-ons, and lewd remarks is often the stuff of

hostile environment claims"). Weinroth says she made clear that Dieckman's physical attention was not welcome, yet it persisted: she pushed Dieckman's hand away when Dieckman touched her, and refused to hug Dieckman back, keeping her arms by her sides. Weinroth's response to Dieckman's physical expressions of affection also undermines defendants' contention that the conduct at issue was of the sort expected between "friendly co-workers."

Finally, Weinroth could have reasonably understood Dieckman's inappropriate touching and frequent compliments to be motivated by sexual desire. She says that, when Dieckman reached under the table and rubbed her bare thigh, she thought that Dieckman "was trying to feel [her] up." Document No. 35-2. And, when Dieckman repeatedly complimented her, Weinroth understood that Dieckman was doing so, in context, because she "wanted to have a sexual relationship" with her. Document No. 35-2

The described behavior, in the context of Dieckman's sexual orientation, is sufficient to support Weinroth's claim that the alleged conduct meets Title VII's "because of sex" requirement.

**B.** **Objectively Severe or Pervasive**

Defendants next argue that no reasonable person would objectively view the conduct alleged by plaintiff as sufficiently abusive to reach the level of "severe" or

27

"pervasive."  In support of that argument, defendants rely on
several different cases in which courts have "found conduct <u>far</u>
more egregious than the conduct alleged in the present case to
be insufficient to constitute actionable harassment."  Defs.'
Mem. in Supp. of Summary Judgment at 22 (emphasis in original).

However, given the circumstantial nature of hostile work
environment claims, comparison to other cases provides only
limited assistance.  As the Court of Appeals for the First
Circuit has noted:

> The highly fact-specific nature of a hostile
> environment claim tends to make it difficult to draw
> meaningful contrasts between one case and another for
> purposes of distinguishing between sufficiently and
> insufficiently abusive behavior. Conduct that amounts
> to sexual harassment under one set of circumstances
> may, in a different context, equate with the sort of
> "'merely offensive'" behavior that lies beyond the
> purview of Title VII, and vice versa.  <u>See [Marrero
> v. Goya of P.R., Inc.,</u> 304 F.3d 7, 18-19 (1st Cir.
> 2002) (quoting <u>Harris,</u> 510 U.S. at 21)].  Again, we
> agree with the Second Circuit that "the fact that ...
> actions did not constitute a hostile work environment
> in [one] case, when considered as part of all the
> circumstances there, does not establish a rule that
> similar actions in another context would not, as a
> matter of law, amount to one."  <u>Schiano [v. Quality
> Payroll Sys., Inc.,</u> 445 F.3d 597, 607 (2d Cir.
> 2006)].

<u>Billings</u>, 515 F.3d at 49.  The "hostile environment question is
commonly one of degree — both as to severity and pervasiveness —
to be resolved by the trier of fact on the basis of inferences
drawn from a broad array of circumstantial and often conflicting
evidence."  <u>Id.</u> at 50 (internal quotation marks omitted).

Given the disputed material facts at issue here, whether the alleged acts of sexual harassment were severe or pervasive enough to constitute a hostile work environment is a question for a jury. Again, for summary judgment purposes, the contested facts must be taken in the light most favorable to plaintiff. In that light, the facts show that, over a period of approximately 18-months, Dieckman intentionally rubbed Weinroth's bare thigh underneath a table during a work meeting, put her arm around Weinroth's waist, imposed unsolicited and unwelcome hugs, called her a pet name, and declared that she loved her. Weinroth does not describe just a few isolated incidents, but rather regular, repeated, and unwanted touching.

To be clear, plaintiff's evidence is thin, contested, and somewhat inconsistent, and a jury could easily reject her version of events. It is, however, sufficient at this stage to avoid summary judgment. See Vera v. McHugh, 622 F.3d 17, 29 (1st Cir. 2010) ("it is one thing to say that employees must learn to tolerate simple teasing, offhand comments, and isolated incidents (unless extremely serious). . . . It is quite another to require employees to suffer the constant attentions of a lascivious supervisor.") (internal quotation omitted). Crediting Weinroth's statement, as the court must, she describes workplace conduct that plainly crosses the line.

29

### C.  **Employer Liability**

Finally, defendants argue that Weinroth fails to demonstrate a legal basis for holding New Hampshire Hospital or Dartmouth-Hitchcock Clinic liable for the alleged harassment.

### 1.  **New Hampshire Hospital**

"[T]he appropriate standard governing employer liability for hostile work environment sexual harassment depends on whether a supervisor or coworker initiated the harassment." Rand v. Town of Exeter, 976 F. Supp. 2d 65, 72 (D.N.H. 2013) (citations omitted).  If a supervisor is responsible for the harassment, an employer is vicariously liable unless an affirmative defense is available.  Lee-Crespo, 354 F.3d at 34. See also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998) (an "employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.").  Where the harasser is a co-worker, however, an employer can only be liable "if the harassment is causally connected to some negligence on the employer's part."  Wilson v. Moulison N. Corp., 639 F.3d 1, 7 (1st Cir. 2011).  So, a plaintiff "must demonstrate that the employer knew or should have known about the harassment yet failed to take prompt and appropriate remedial action".  Rand, 976 F. Supp. 2d at 72 (further quotations omitted).

The hospital contends that it cannot be held liable for
Dieckman's purported sexual harassment for two reasons.  First,
it says, Dieckman was not Weinroth's supervisor, so the hospital
is not vicariously liable.  Second, the hospital took reasonable
and appropriate steps in response to Weinroth's complaint, so,
assuming Dieckman was a co-worker, the hospital cannot be found
negligent.

### a.    Dieckman's Supervisory Status

Whether Dieckman was Weinroth's supervisor for Title VII
purposes is a matter of dispute between the parties.[12]  The
hospital argues that Dieckman's authority as a contractor/
consultant was limited to overseeing Weinroth's day-to-day
performance of assigned tasks, and that she had no legal or
actual authority to hire, fire, demote, promote, transfer, or

---

[12]    The court assumes without deciding that there may be
circumstances that give rise to vicarious employer liability
based upon the conduct of a non-employee supervisor who acts on
behalf of the employer.  But see, Berry v. Delta Airlines, Inc.,
260 F.3d 803, 812 (7th Cir. 2001) ("To the extent that these
cases provide that an employer can be held vicariously liable
under Title VII for sexual harassment committed by an employee
of an independent contractor (and not merely for its own
negligence in addressing the problem), they would appear to be
in tension with recent Supreme Court precedent, since an
employee of an independent contractor typically cannot be
considered an agent of the employer." (citing Burlington
Industries, Inc., 524 U.S. at 754-60 (holding that an employer
ordinarily is vicariously liable for the harassment perpetrated
by one of its employees only to the extent provided by the law
of agency); Faragher, 524 U.S. 775 (1998); EEOC v. Indiana Bell
Telephone Co., Inc., 256 F.3d 516 (7th Cir. 2001).).

discipline Weinroth.  In response, Weinroth argues that Dieckman had the power to recommend discipline (or otherwise effectively influence hospital employees' disciplinary decisions through her recommendations), and she points out that Dieckman's name appeared on her November, 2019, Memo of Counsel.

"[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim."  Vance v. Ball State Univ., 570 U.S. 421, 450 (2013). A supervisor, regardless of their job title, has "actual authority [which] primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." Velazquez-Perez v. Devs. Diversified Realty Corp., 753 F.3d 265, 271 (1st Cir. 2014) (quotations omitted).

Dieckman appears to have recommended employer action on occasion regarding Weinroth; she contributed to the drafting of the November, 2019, Memo of Counsel; and she signed the Memo in some capacity (along with Moquin, the actual supervisor).  The hospital counters that the Memo of Counsel cannot be considered "discipline," but instead is properly viewed as "coaching."  On that point, the record evidence is murky.  For example, Moquin testified that she considered a Memo of Counsel "discipline," explaining that, under the collective bargaining agreement with Weinroth's union, a notation of counseling is the "first step"

in the disciplinary process.  Document No. 30-11 (Moquin Dep.)
at 28:12-19.  If a memo of counseling was, in fact, the first
step in the hospital's progressive disciplinary process, it
stands to reason that it might qualify as "discipline."

But later, Moquin contradicted herself, testifying that the
Memo was "not considered discipline because it's counsel, and
with this union contract, counsel didn't . . . count towards
discipline at all, it's considered coaching, essentially."  Id.
at 108:19-22.  See also Document No. 30-17 (McCann Dep.) at
12:1-8 (opining on whether memos of counsel are disciplinary
actions: "Q: Do you consider those discipline?  A: No.  Q: Why
do you say that?  A:  The structure in the state is that memos
of counsel are performance improvement tools and letters of
warning are disciplinary.").

Dieckman had some ability to effectively influence or
recommend disciplinary action as well.  During Moquin's
deposition, she referred to a September, 2019, email that
Dieckman sent to Moquin, which seemingly requested that Weinroth
be disciplined.  (The September, 2019, email itself is not in
the record.)  And, McCann testified that Dieckman likely
contributed to Weinroth's review, stating that she "would assume
that [Dieckman] was collaborating with Heather Moquin to do the
review."  Document No. 30-17 (McCann Dep.) at 80:15-83:20.
McCann explained, "Dartmouth employees provided information to

33

the state supervisors in regards to performance if there were –
if it covered the scope of work that they were overseeing as a
project manager or a medical doctor, for example, a psychiatric
doctor." Id. at 58:20 - 59:2.  Dieckman's recommendations and
evaluations probably carried some weight with hospital
administrators, who did have the authority to discipline
Weinroth, given Dieckman's role as a project consultant and her
daily interactions with the state employees working on the
project.

"[A]t some point the ability to provide advice and feedback
may rise to the level of delegated authority sufficient to make
someone a supervisor." Velazquez-Perez, 753 F.3d at 272.  But
the circumstances presented here do not rise to that level.

"Ordinarily, the determination of whether an employee is a
de facto supervisor for Title VII purposes is factual in
nature." Wilson, 639 F.3d at 9 (internal quotations omitted).
"Even so, a minimum factual predicate must be present to avoid
summary judgment on such an issue." Id. (internal quotations
omitted).  Weinroth fails to establish that minimum factual
predicate, because she points to no evidence in the current
record that Dieckman had any hand in Weinroth's hiring, salary,
promoting her, determining her benefits, or setting the hours
she worked.  Dieckman repeatedly testified that she was not
Weinroth's supervisor, had no supervisory responsibility over

Weinroth, and that, while she may have worked closely with
Moquin, and been consulted by Moquin with respect to Weinroth's
discipline, she never initiated the discipline of any IS team
member.  See, e.g., Document No. 30-10 (Dieckman Dep.) at 27:10-
29:3; 47:21-48:14; 51:13-15.  Weinroth herself repeatedly
testified that Dieckman "wasn't allowed to write [her] up for
anything."  Document No. 30-6 (Weinroth Dep.) at 72:20-23; see
also id., at 125:7:14.  Finally, hospital administrators
testified that Dieckman had no delegated authority to take
tangible employment action against Weinroth.  See, e.g.,
Document No. 30-17 (McCann Dep.) at 59:14-19 (McCann testifying
concerning agreement between Dartmouth Hitchcock Clinic and the
hospital: "The structure that we . . . set up was that we would
have the Dartmouth staff there to support project management,
clinical expertise and leadership skills and other traits that
the state employees didn't have and they would work – but the
supervision would be a state employee."); Document No. 30-11
(Moquin Dep.) at 29:10-15 (Moquin testifying that "Dieckman's
role was supervising the technical work that they did, providing
guidance, but there's a very clear separation, especially within
the union agreement, that consultants do not do discipline or
provide that direct supervision."); id. at 118:19-21 (Moquin
testifying that she was the "only one that could conduct . . .
investigations or pursue discipline if it was necessary.").  No

evidence of record suggests a different degree of involvement by Dieckman.

Nor does Weinroth point to any evidence that suggests Dieckman's disciplinary recommendations were simply "rubber-stamped" by hospital administrators – essentially empowering her to act as an actual supervisory agent of the State with respect to state employees.  The uncontested evidence on that point is to the contrary.  Moquin, Weinroth's boss, testified that, while she solicited input from co-workers on Weinroth's performance, she ultimately was "the one . . . providing the evaluations," investigating allegations relating to Weinroth's misconduct, and determining appropriate discipline.  Document No. 31-11 (Moquin Dep.) at 29:21-30:8; see also id. at 54:15-55:9 (testifying that decision to issue letter of warning to Weinroth was based solely on Moquin's own investigation, and no input from Dieckman).  Moquin's testimony concerning an email Dieckman sent to her and McCann that requested corrective action be taken with respect to Weinroth's relationships with her co-workers is exemplary of the dynamic between Moquin, Dieckman, and Weinroth:

> Q:   Would it be fair to say that [Dieckman's request] is a supervisory activity?
>
> Counsel:   Objection
>
> A:   Well, she could make that recommendation, but as you can see from McCann's response [to Dieckman's email], that really fell to myself or Lori Shibinette.  You know, the SEA is very

> specific on how that happens and so, you know,
> she certainly could make that suggestion.  I've
> had co-workers make that suggestion about other
> co-workers, but at the end of the day that was
> not in her control.

Id. at 106:21-107:16.

> In Velazquez-Perez, our court of appeals stated:
>
> There is nothing in Vance . . . to warrant ignoring
> the difference between providing advice and feedback
> to one who has independent sources of information and
> truly makes the decision, and providing a
> recommendation to one whose acceptance of the
> recommendation is pro forma.  Vance makes clear that
> the latter situation can support a finding of
> delegated supervisory authority.  Were we also to
> treat the former situation as such a delegation, much
> of the clarity and predictability Vance seeks to
> ensure would be lost.

753 F.3d 265, 272 (1st Cir. 2014).  So too, here.  See also

E.E.O.C. v. CRST Van Expedited, Inc., 679 F.3d 657, 685 (8th

Cir. 2012) ("a coworker's authority to make mere recommendations

or evaluations to a superior about tangible employment decisions

pertaining to a fellow employee does not constructively promote

that coworker to a supervisor for purposes of vicarious Title

VII liability") (citations omitted); Andonissamy v. Hewlett-

Packard Co., 547 F.3d 841, 848 (7th Cir. 2008) ("directing work

activities and recommending disciplinary action are not in and

of themselves sufficient to make someone a supervisor under

Title VII.") (citation omitted).

Plaintiff fails to point to any evidence that Dieckman was empowered by the hospital to take "tangible employment actions" against Weinroth.  Vance, 570 U.S. at 429.  The evidence upon which Weinroth relies is insufficient to establish that Dieckman had any direct power to hire, fire, demote, discipline, transfer, or otherwise directly affect the terms and conditions of Weinroth's employment.  See Noviello v. City of Bos., 398 F.3d 76, 96 (1st Cir. 2005) ("the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment.").  Nor has Weinroth pointed to any evidence sufficient to support a claim that Dieckman's recommendations regarding discipline or terms of employment were accepted by state authorities on a pro forma basis. Accordingly, the court finds that, even drawing all inferences in plaintiff's favor, no reasonable jury could conclude that Dieckman was Weinroth's supervisor for purposes of Title VII.

### b.    New Hampshire Hospital's Negligence

When a co-worker is the harasser, an employer is liable only if the employee can demonstrate that the employer "knew or should have known of the . . . harassment and failed to implement prompt and appropriate remedial action." Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002) (internal quotation omitted).  Our court of appeals instructs that "what constitutes a 'prompt and appropriate' employer response to

allegations of sexual harassment often requires the sort of case-specific, fact-intensive analysis best left to a jury." Forrest v. Brinker Intl. Payroll Co., LP, 511 F.3d 225, 232 (1st Cir. 2007). However, "summary judgment will lie when the undisputed facts show that a reasonable jury could not help but conclude that the employer's response was both timely and appropriate." Wilson, 639 F.3d at 8 (citations omitted).

At some point, Weinroth complained to McCann in Human Resources about Dieckman's sexually harassing conduct. The hospital, then, had actual notice of Dieckman's purported harassment. The issue of potential employer liability then turns on whether the hospital engaged in a "good faith effort to implement an effective remedial measure," keeping in mind that the "negligence analysis requires the court to review the employer's actions for reasonableness, not conduct an independent review of the underlying allegations." Caruso v. Delta Air Lines, Inc., 113 F.4th 56, 73, 70 (1st Cir. 2024) (citations omitted). See also Wilson, 639 F.3d at 8 ("the imposition of employee discipline is not a rote exercise, and an employer must be accorded some flexibility in selecting condign sanctions for particular instances of employee misconduct.").

The hospital's response must, of course, be assessed in context – that is, keeping in mind that – in the course of speaking with McCann, Weinroth expressly declined to pursue a

formal complaint.  She did not wish to have the matter referred

for third party investigation by the State Department of

Personnel.  Even so, that is, despite Weinroth's declination,

the hospital nevertheless took prompt action in response to her

complaint.  McCann reminded Weinroth that if, after thinking

about it, she wanted a formal investigation by the State

Personnel Office, that would be done.  And, McCann still

reported Weinroth's complaint up the chain of command to her own

supervisors who considered the matter, but deferred to

Weinroth's wishes.  McCann also spoke with Moquin, who then took

remedial action by sitting in on future one-on-one meetings

between Dieckman and Weinroth to preclude inappropriate conduct.

Moquin informally confronted Dieckman with the allegations and

informally counselled Dieckman about maintaining stricter

personal boundaries in the workplace going forward, prompting

Dieckman to obtain additional advice from McCann about best

practices in dealing with Weinroth going forward.

    Weinroth seems to argue that the hospital ought to have

taken additional action to investigate or address her complaint

(despite her express request to the contrary).  The hospital's

reliance on Weinroth's own wishes at the time she made her

initial complaint – that she did not want to go forward with a

formal investigation – was entirely reasonable.  The "law will

not presume in every case that harassed members of Title VII's

protected classes do not know what is best for themselves and
cannot make reasonable decisions to delay — at least for a time
— pursuing harassment claims, perhaps for privacy or emotional
reasons, until they are ready to do so." Torres v. Pisano, 116
F.3d 625, 639 (2d Cir. 1997) (finding supervisor did not
unreasonably respond to employee's reporting of sexual
harassment claims by waiting to investigate, where the employee
requested that supervisor keep the matter confidential).

But, again, the hospital did not simply defer a formal
investigation. It took reasonable and appropriate steps,
institutionally, to ensure that the conduct Weinroth complained
about, assuming it happened, would not be repeated, including
making her supervisors aware, counselling the alleged
perpetrator, providing for supervision during office meetings,
and advising Weinroth that she was free to change her mind about
a formal complaint and investigation. See, e.g., Document No.
30-6 (Weinroth Dep.) at 45:7-22 (Weinroth testifying that, after
she spoke with McCann, she "did not see much of [Dieckman]" that
Dieckman would "barely talk to [her] at all," and that the
compliments stopped); Document No. 30-7 (Statement of Weinroth
Taken by G. Marchese on Jun. 26, 2020) (after speaking with
McCann, Weinroth's "one-on-one meetings with Ms. Dieckman were
no longer just the two of us. Heather Moquin, CEO, attended
those. After this, there were no other instances of Ms.

41

Dieckman touching me during the weekly one-on-one meetings.").
While the alleged conference room waist-touching incident did
post-date the actions taken by the hospital, that fact is not
dispositive.  That is because an "employer's disciplinary
decision must be evaluated in real time; it cannot be evaluated
in hindsight."  Wilson, 639 F.3d at 8.  That the hospital's
efforts were not completely successful does not necessarily
beget the conclusion that those efforts were necessarily
inappropriate or untimely.  See, e.g., id., ("plaintiff's
argument that the sanction must have been inadequate because it
was ineffective to stop the harassment is nothing more than a
post hoc rationalization").  See also Thirkield v. Neary &
Hunter OB/GYN, LLC, 76 F. Supp. 3d 339, 348 (D. Mass. 2015)
(responding to plaintiff's argument that employer's response was
not appropriate where harassing conduct continued after
employer's reprimand: "a post hoc rationalization sheds no light
on whether [employer's] response was 'appropriate' at the
time").

      Despite McCann's instruction that Weinroth should report
any additional incidents involving Dieckman to Human Resources,
Weinroth did not report the waist-touching incident.  Our court
of appeals addressed a similar factual circumstance in Wilson,
where:

> The company, in keeping with its obligations under
> Title VII, had in place a clearly stated
> antiharassment policy, which directed aggrieved
> employees to report harassment either to a supervisor
> or to the owner.  The plaintiff was aware of this
> policy (indeed, he used it successfully to report the
> initial harassment) yet failed to adhere to it with
> respect to the subsequent incidents of harassment.
> This omission occurred despite the fact that [company
> owner] reinforced the policy by explicitly
> instructing the plaintiff to speak directly to him.
> Under these circumstances, the plaintiff's failure to
> put the defendant on notice of the renewed harassment
> is fatal to his claim of employer liability.  See
> Thompson v. Coca-Cola Co., 522 F.3d 168, 180-81 (1st
> Cir. 2008); Fontánez-Núñez v. Janssen Ortho LLC, 447
> F.3d 50, 57 (1st Cir. 2006).

Wilson, 639 F.3d at 11.[13]  Finally, after Weinroth resigned, and

a week later renewed her harassment complaint, the hospital

promptly referred the matter for investigation by the State

Department of Personnel.

The court finds that no reasonable juror could conclude on

the current record that the hospital failed to take "prompt and

appropriate ameliorative action."  Wilson, 639 F.3d at 8.  The

hospital is therefore entitled to summary judgment on Weinroth's

hostile work environment claim.

### 2.  Dartmouth-Hitchcock

Dartmouth-Hitchcock argues that it cannot be found liable

for Dieckman's alleged sexual harassment since Weinroth was not

---

[13]    The hospital does not invoke their antiharassment policy,
and the plaintiff mentions it only generally, and in passing.
In any event, there is no basis upon which negligence could be
found.

an employee of Dartmouth-Hitchcock, was neither supervised nor
controlled by Dartmouth-Hitchcock, and did not work at a
Dartmouth-Hitchcock location.  And, they argue, even assuming
that Dieckman did sexually harass Weinroth, Dieckman would have
been acting outside the scope of her employment with Dartmouth-
Hitchcock.  Finally, Dartmouth-Hitchcock points to the absence
of any record evidence suggesting that it was aware of
Dieckman's alleged conduct, or of any previous claims of sexual
harassment tied to Dieckman's conduct.

> As recently noted by our court of appeals:

> The employer-employee relationship is a crucial part
> of a Title VII claim because Title VII imposes
> liability only on "employers."  See 42 U.S.C. §
> 2000e-2(a) ("It shall be an unlawful employment
> practice for an employer ... to discriminate against
> any individual with respect to his compensation,
> terms, conditions, or privileges of employment,
> because of such individual's ... sex .... " (emphasis
> added)); Fantini v. Salem State Coll., 557 F.3d 22,
> 30 (1st Cir. 2009) ("[T]here is no individual
> employee liability under Title VII.").  That is why
> our Title VII hostile work environment framework
> requires that the plaintiff establish "some basis for
> employer liability."

Pike v. Budd, 133 F.4th at 86 (emphasis added).

Weinroth was not an employee of Dartmouth-Hitchcock.
Weinroth does not allege she had any sort of employment
relationship with Dartmouth-Hitchcock, or that Dartmouth-
Hitchcock had any control over her job performance, or the terms
or conditions of her employment.  So, it cannot be said that

Dartmouth-Hitchcock was Weinroth's employer for purposes of Title VII.[14]  Dartmouth-Hitchcock is entitled to summary judgment on Weinroth's hostile work environment claim.[15]

In sum, Weinroth has identified sufficient evidence which, if believed, would support a jury's conclusion that she was subjected to severe or pervasive conduct that was both objectively and subjectively offensive.  However, because she fails to establish a basis for employer liability, defendants' motion for summary judgment on plaintiff's hostile work environment claim is necessarily granted.

## II.  Constructive Discharge

Defendants argue that they are entitled to judgment on plaintiff's constructive discharge claim because Weinroth cannot show actionable harassment, let alone meet the higher standard required for constructive discharge.  Plaintiff responds:

> With respect to constructive discharge within a hostile environment framework, Plaintiff believed she was being harassed and retaliated against and could do nothing right; whereas she had been an excellent employee, as soon as she started rejecting Dieckman's advances, it began going downhill.  The environment

---

[14]  Plaintiff seems to concede the point, as she fails to meaningfully respond to defendants' argument, and instead focuses on Dartmouth-Hitchcock's liability for aiding and abetting Dieckman's and New Hampshire Hospital's conduct.

[15]  For similar reasons, Dartmouth-Hitchcock is entitled to judgment on Weinroth's constructive discharge claim.  That claim necessarily fails as a matter of law since Weinroth could not be "discharged" from a position she never held.

had become so intolerable to her, including that she
sought mental health treatment, that she felt that
she had no viable option but to resign.

Pls. Mem. in Support of Opp. to Summary Judgment at 22.

To prevail on a claim for constructive discharge, an
employee must demonstrate not only that the harassing behavior
was severe enough to alter the terms and conditions of
employment, but also that working conditions were "so
intolerable that a reasonable person would have felt compelled
to resign." Penn. State Police v. Suders, 542 U.S. 129, 146-47
(2004). "The standard is an objective one; it cannot be
triggered solely by the employee's subjective beliefs, no matter
how sincerely held." Marrero v. Goya of Puerto Rico, Inc., 304
F.3d 7, 28 (1st Cir. 2002) (internal quotations omitted).
"Instead, working conditions must be so unpleasant that staying
on the job while seeking redress would have been intolerable."
Id. (internal quotations omitted) (cleaned up).

Weinroth's claims of intolerability are undermined by the
fact that, after speaking with McCann, she expressly declined to
seek redress by filing a formal complaint about Dieckman's
alleged behavior. In other words, Weinroth declined the
opportunity to address the conditions that she now contends were
intolerable. Instead of filing a formal complaint and
attempting to resolve the issues she was having with Dieckman

46

through the hospital's formal remediation process, Weinroth
resigned.

Weinroth argues that she declined to file a formal
complaint because she feared retaliation.  That argument does
not materially move the needle.  "An employee who resigns
without affording the employer a reasonable opportunity to
address her concerns has not been constructively discharged."
Williams v. Barnhill's Buffet Inc., 290 Fed. Appx. 759, 762 (5th
Cir. 2008).  See also Zemrock v. Yankee Candle Co., No. 14-CV-
30107-KAR, 2017 WL 506249, at *9 (D. Mass. Feb. 7, 2017) (no
constructive discharge where plaintiff's "'choice to resign was
grossly premature, as it was based entirely on her own worst-
case-scenario assumption' that [employer] would not correct the
harassment in the store and would permit retribution by the
store's managers, despite Defendant's policy against
retaliation") (quoting E.E.O.C. v. Kohl's Dept. Stores, Inc.,
774 F.3d 127, 134 (1st Cir. 2014)) (further quotations omitted).
"An employee is obliged not to assume the worst, and not to jump
to conclusions too quickly."  Kohl's Dept. Stores, Inc., 774
F.3d at 134 (quotations omitted) (cleaned up).

"[E]valuation of a constructive discharge claim takes into
account how the employer responded to the plaintiff's complaints
and whether it was likely that the harassment would continue."
Lee-Crespo, 354 F.3d 34, 45 (citations omitted).  As discussed

previously, after Weinroth declined to pursue a formal complaint during her conversation with McCann, the hospital still took remedial action in response.  McCann encouraged Weinroth to give additional thought to filing a formal complaint, and she instructed Weinroth to report if Dieckman's behavior persisted. McCann also reported her conversation with Weinroth to her own superiors, and spoke with Moquin, who began sitting in on all of Dieckman's one-on-one meetings with Weinroth.  Moquin also confronted Dieckman with the allegations and counselled Dieckman about maintaining appropriate personal boundaries in the workplace.

To establish constructive discharge, an employee "must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship." Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir. 2008) (quoting Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004)).  "Thus, in order for a resignation to constitute a constructive discharge, it effectively must be void of choice or free will." Id.  Given the evidence in the current record, no reasonable juror could find that standard met.  Because Weinroth has failed to point to sufficient evidence to support her constructive discharge claim, defendants are entitled to summary judgment.

## III. Aiding and Abetting Discrimination

Plaintiff asserts a claim for aiding and abetting discrimination under N.H. Rev. Stat. Ann. 354-A against Dieckman and Dartmouth-Hitchcock.  Summary judgment is appropriate on both claims.

"Section 354-A prohibits employers both from engaging in any 'unlawful discriminatory practice' and from aiding or abetting such a practice.  Soderman v. Shaw's Supermarkets, Inc., No. 17-CV-076-PB, 2017 WL 3738460, at *4 (D.N.H. Aug. 30, 2017) (citations omitted).  "The New Hampshire Supreme Court [has] extended liability beyond employers to individuals who aid or abet workplace discrimination." Id.  (citing U.S. Equal Employment Opportunity Commission v. Fred Fuller Oil Company, Inc., 168 N.H. 606, 608, 611 (2016).  "In doing so, the court explained that 'any act of aiding, abetting, inciting, compelling or coercing another to commit an unlawful discriminatory practice, or attempting to do so, or obstructing or preventing any person from complying with the chapter is itself an unlawful discriminatory practice.'" Id. (quoting Fuller, 168 N.H. at 610).

### A.   Dartmouth-Hitchcock

With respect to Weinroth's aiding and abetting claim against Dartmouth-Hitchcock, defendants argue that plaintiff fails to present evidence that Dartmouth-Hitchcock aided and

abetted any unlawful discriminatory practice <u>by an employer</u> (as required by the statute), since Dieckman was not Weinroth's employer.  It further argues that Weinroth fails to point to evidence sufficient to support a finding that Dartmouth-Hitchcock aided or abetted the alleged discrimination or retaliation.  Plaintiff responds that, because Dartmouth-Hitchcock employed Dieckman and she was acting as their agent, Dartmouth-Hitchcock is vicariously liable for Dieckman's actions, including for aiding and abetting the purported discrimination.

As a preliminary matter, neither party meaningfully addresses whether individuals who are "not employed by the plaintiff's employer may be liable" under the statute.  <u>Fuller</u>, 168 N.H. at 613.  In <u>Fuller</u>, after determining that RSA 354-A:19 "imposes liability upon individual employees for retaliation in the workplace," the New Hampshire Supreme Court explicitly stated that it was <u>not</u> addressing "whether individuals <u>who are</u> <u>not employed by the plaintiff's employer</u> may be liable" under the statute.  <u>Id.</u> (emphasis added).  That question seemingly remains unsettled as a matter of state law.

But, assuming without deciding that Dartmouth-Hitchcock could be held liable under the statute, Weinroth's claim still founders.  She fails to present evidence that Dartmouth-Hitchcock did anything to aid and abet the alleged

discriminatory conduct.  The record establishes only that
Dartmouth-Hitchcock hired Dieckman, and assigned her to work as
a consultant to New Hampshire Hospital.  There is no evidence in
the record that Dartmouth-Hitchcock intended to discriminate
against Weinroth; took any action to encourage, or enable
Dieckman's alleged conduct; or had any knowledge at all of
Dieckman's alleged conduct.  Accordingly, Dartmouth-Hitchcock is
entitled to summary judgment on Weinroth's aiding and abetting
claim.

### B.  **Dieckman**

Dieckman is also entitled to summary judgment on Weinroth's
aiding and abetting claim.  Again, whether an individual not
employed by the plaintiff's employer may be liable for aiding
and abetting under New Hampshire RSA 354-A is unsettled.  But,
assuming Dieckman could be held liable, Weinroth's aiding and
abetting claim against her fails.

In support of her claim against Dieckman, Weinroth argues
that New Hampshire Hospital engaged in discriminatory behavior
by failing to adequately investigate her claims of harassment.
She says that, while "Dieckman was the primary individual doing
the discrimination," neither Dieckman nor the hospital "could
have continued unaided by the other."  Document No. 35-1 at 22.

That argument is not persuasive.  First, Dieckman's conduct
serves as the predicate for Weinroth's hostile work environment

claim.  Dieckman, the alleged actor, cannot aid and abet her own
conduct.  Second, when coworkers are alleged to be responsible
for a hostile work environment, employer liability is based on
the employer's own negligence – that the employer "knew or
should have known of the charged sexual harassment and failed to
implement prompt and appropriate action." Crowley v. L.L. Bean,
303 F.3d at 401 (internal quotations omitted).  Weinroth adduces
no evidence that might suggest Dieckman participated in or
played any role at all in the hospital's response to Weinroth's
allegations of harassment.

Defendants' motion for summary judgment on Weinroth's
aiding and abetting claim against Dieckman is granted.

**IV.  Retaliation**

Finally, Weinroth asserts two retaliation claims.  The
first is asserted against New Hampshire Hospital and Dartmouth-
Hitchcock, pursuant to Title VII and N.H. Rev. Stat. Ann. 354-A.
The second claim is asserted against Dieckman, brought pursuant
to N.H. Rev. Stat. Ann. 354-A.

To prove a claim of retaliation under Title VII, the
plaintiff must demonstrate that (1) she engaged in protected
conduct, (2) the employer took an adverse employment action, and
(3) the protected conduct and the adverse action were causally
linked.  See Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 115
(1st Cir. 2024).  Once the plaintiff establishes a prima facie

case of retaliation, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions."  Id. (internal quotations omitted).  If defendant does so, then the burden then shifts back again to the plaintiff to "show that the defendant's explanation is a pretext for unlawful retaliation."  Id.

### A.   Dartmouth-Hitchcock

Defendants argue that plaintiff's retaliation claim against Dartmouth-Hitchcock should be dismissed for similar reasons as her hostile work environment claim against Dartmouth-Hitchcock: Dartmouth-Hitchcock was not Weinroth's employer.  They also point out that there is no evidence in the record that Dartmouth-Hitchcock either knew about any protected action taken by Weinroth, or that Dartmouth-Hitchcock took any adverse action against Weinroth in response (or was aware of any alleged actionable retaliation by Dieckman).

The court agrees.  Dartmouth-Hitchcock is entitled to summary judgment on Weinroth's retaliation claim.

### B.   New Hampshire Hospital

Defendants argue that the hospital is entitled to judgment on Weinroth's retaliation claim because Weinroth fails to establish a prima facie case of retaliation.  Weinroth argues in response:

> Defendant Dieckman was spoken to by Moquin in or
> around April 2019 about Ms. Weinroth's complaint.
> . . . Shortly after that, the corrective actions
> were increased, for things that were not actually
> misconduct or disruptive, like accidentally knocking
> over a plant, or asking a coworker why she needed
> help on something she had performed for years. Ms.
> Weinroth reported what she reasonably believed was
> sexual harassment, but after the initial response and
> immediate discipline, which she believed to be
> retaliatory, she gave up.

Pls. Mem. in Opp. to Mot. for Summary Judgment at 23.

For purposes of the present motion, the court accepts
Weinroth's version of events as set forth in her declaration in
support of her opposition to summary judgment. See Document No.
35-2. That declaration states that Weinroth reported Dieckman's
conduct to McCann on January 28, 2020. Document No. 35-2. The
next day, Weinroth says, she was "written up for alleged
disruptive behavior," receiving a Notice of Investigation into
her conduct on January 29, 2020, which, she asserts, "was done
due to [her] reporting Dieckman to HR (McCann) the day before."
Id. The Notice of Investigation ultimately led to the Letter of
Warning that Weinroth received in February, 2020.

### 1. <u>Adverse Employment Action & Causal Connection</u>

First, to determine whether receipt of the Letter of
Warning was a "materially adverse" employment action, the court
must assess whether the alleged retaliatory acts would have
"dissuaded a reasonable employee from making a complaint of
discrimination." <u>Stratton v. Bentley</u>, 113 F. 4th 25, 44 (1st

Cir. 2024).  "In answering that question, [the court] would have to keep in mind that retaliation need not have a dramatic impact on a plaintiff's job or even relate to the terms or conditions of employment."  Id. (internal quotations and citation omitted).

If the Letter of Warning is construed as a "criticism that carries with it no consequences," the letter is "not materially adverse and therefore not actionable."  Flowers v. FLLAC Educ. Collaborative, No. 18-1170, 2019 WL 10982432, at *3 (1st Cir. July 10, 2019).  The Letter of Warning Weinroth received was plainly an early step in a progressive discipline regime.  Each infraction increased the potential discipline for later infractions.  Arguably, an employee might decide against reporting discrimination if that report might result in an increased potential for later disciplinary action.

With respect to causation, Weinroth seemingly takes the position that causation can be inferred by the mere temporal proximity between her conversation with McCann, and her receipt of the Notice of Investigation the following day.  To be sure, temporal proximity between protected activity and adverse action might raise an eyebrow if there were evidentiary support for the timing that Weinroth endorses.  See Stratton, 113 F.4th at 45 ("an inference of causation may be appropriate where there is close temporal proximity between protected activity and an adverse action") (citation omitted).  But, given the lack of

evidentiary support for the timeline in question, the court declines to weigh that proximity as heavily as it otherwise might.

Weinroth repeatedly contradicts her own declaration in her brief regarding the timing of her report to McCann.  She argues in her brief that she complained twice: in April, 2019, and then again on January 28, 2020.  See, e.g., Pls.' Br. in Opp. to Summary Judgment at 12 ("Ms. Weinroth then reported the thigh incident that she thought occurred on May 15, 2019 to McCann in our around April 23, 2019."); see also id., at pp. 6, 8, 11, 21, 23.  However, there is no evidence in the record that would support a finding that Weinroth complained to McCann twice. And, for their part, defendants suggest that Weinroth's complaint to McCann likely occurred in November, 2019.  That suggestion is bolstered by evidence that Moquin began attending one-on-one meetings between Dieckman and Weinroth beginning in November 25, 2019.  In any event, given the factual uncertainty in the current record with regard to the date that Weinroth complained to McCann, temporal proximity is of less significance than it might be.

Additionally, there is nothing in the record besides a temporal proximity that links Weinroth's alleged bad conduct in the workplace with her complaints about Dieckman.  Weinroth's prima facie case is markedly weak.  But, for purposes of the

56

present motion, the court will afford her the benefit of the
doubt and proceed to the next step of the analysis.

### 2.  **Pretext**

"Once the plaintiff has made a prima facie showing of
retaliation, the McDonnell Douglas burden-shifting approach is
employed, and defendant must articulate a legitimate, non-
retaliatory reason for its employment decision." Calero-Cerezo
v. U.S. Dept. of Justice, 355 F.3d 6, 26 (1st Cir. 2004).

The hospital satisfies its burden.  The record evidence
shows that the January, 2020, investigation that led to the
February 10 Letter of Warning was initiated by Moquin after she
received a report from Wurtz that Weinroth was "rude and
hostile" while Wurtz was training a new employee on January 28.
Document No. 30-5.  Multiple witnesses supported Wurtz's version
of events.  And, when Moquin spoke with Weinroth in the course
of her investigation into Wurtz's allegations, Weinroth did not
mention Dieckman, but instead asked Moquin to investigate Wurtz
for bullying Weinroth.  Nor did Weinroth raise Dieckman's
harassment in her February 18, 2020 rebuttal letter, which
denied that she had been disruptive or disrespectful.

The burden then shifts back to Weinroth to demonstrate that
the hospital's proffered reason was pretextual for
discrimination.  "To defeat summary judgment in a retaliation
case, a plaintiff must point to some evidence of retaliation by

a pertinent decisionmaker." Planadeball v. Wyndham Vacation
Resorts, Inc., 793 F.3d 169, 179 (1st Cir. 2015) (internal
quotations omitted). "Pretext and retaliatory animus may be
shown by "deviations from standard procedures, the sequence of
occurrences leading up to a challenged decision, and close
temporal proximity between relevant events." Serrano-Colon v.
United States Dept. of Homeland Sec., 121 F.4th 259, 273 (1st
Cir. 2024) (internal quotation omitted) (emphasis added).

Weinroth has not carried her burden. The only evidence she
points to in support is the (tenuous) temporal proximity
evidence discussed. That is not enough. See id. (holding that
temporal proximity "is not sufficient, by itself, to raise an
inference of pretext."). See also Carreras v. Sajo, Garcia &
Partners, 596 F.3d 25, 38 (1st Cir. 2010) (where only evidence
supporting retaliation claim was temporal proximity, "temporal
proximity may suffice for a prima facie case of retaliation
. . . but does not satisfy [plaintiff's] ultimate burden to
establish that the true explanation for his firing was
retaliation for engaging in protected conduct rather than poor
performance."). Weinroth points to no other evidence that the
hospital's proffered reasons for disciplining her are
pretextual. To the contrary, Weinroth's history of disruptive
and rude conduct in the workplace is supported by evidence in
the record.

Because Weinroth fails to carry her burden to demonstrate retaliatory motive on the hospital's behalf, the hospital is entitled to summary judgment on Weinroth's retaliation claim against it.

### C.  Dieckman

Finally, Dieckman is entitled to summary judgment on Weinroth's retaliation claim against her.  Like plaintiff's aiding and abetting claim against Dieckman, her retaliation claim depends on whether individuals who are "not employed by plaintiff's employer may be liable" under New Hampshire's Law Against Discrimination; and (2) whether those individuals may be held liable for retaliation under N.H. Rev. Stat. §§ 354-A:19. Fuller, 168 N.H. at 613.[16]  The parties have not briefed the issue, and the New Hampshire Supreme Court has not weighed in.

Even assuming that New Hampshire's Law Against Discrimination provides a basis for holding Dieckman liable, Weinroth fails to present competent evidence that Dieckman "discharge[d], expel[ed], or otherwise retaliate[d] or discriminate[d]" against Weinroth.  N.H. Rev. Stat. Ann. § 354-A:19.  As discussed herein, as a contractor, Dieckman's authority over the terms and conditions of Weinroth's employment

---

[16]     To the extent that plaintiff is arguing that Dieckman ought to be considered an employee of the hospital, she fails to demonstrate a sufficient basis for such a finding.

was limited.  Moquin testified that Dieckman played no role in the initiation of her January, 2020, investigation, or the Letter of Warning, <u>see</u> Document No. 30-11 (Moquin Dep.) at 45:17-46:6, and Weinroth points to no evidence that contradicts Moquin's testimony with respect to Dieckman's involvement. Weinroth also testified that Dieckman was not "allowed" to write her up.  Document No. 30-6 (Weinroth Dep.) at 72:20-23; <u>see also</u> <u>id.</u>, at 125:7:14.

For these reasons, Dieckman is entitled to summary judgment on Weinroth's retaliation claim against her.

<u>**CONCLUSION**</u>

For the foregoing reasons, as well as those set forth in defendants' memoranda (documents no. 31 and 38), defendants' motion for summary judgment (document no. 30) is <u>**GRANTED**</u> **as to all remaining claims in plaintiff's complaint.**

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 30, 2025

cc:  Counsel of Record